IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF NINE (9) DIGITAL DEVICES DESCRIBED IN DETAIL BELOW | Case No. |
| | Filed Under Seal |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jeremy S. Tendler, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following electronic devices, hereinafter "the SUBJECT DEVICES". Each of the Subject Devices is presently in the physical custody of the United States Postal Inspection Service. The devices are also described individually in Attachments A-1 through A-9, for the things described in Attachment B:

   a. Black Microsoft Surface Pro Tablet computer with serial number 025789454253;

   b. Apple iPad model A1709 bearing serial number DMPWCHUNHPDV;

   c. One red SanDisk Cruzer Blade 16GB USB storage device;

   d. One blue and silver USB storage device with the following imprinting "Team 16GB/3.0";

   e. Black Meizu cellular phone – this device does not appear to have a visible serial number or model number;

   f. Red Seagate FreeAgent GoFlex with Product Number: 9ZF2A9-501 and Serial Number: NA02L95D;

1

g. White iPhone model MQ7T2LL/A with serial number C6KVCEPTJC6M in a black case;

h. White iPhone with red and white case with the word "Supreme" printed on it – two Subscriber Identification Module (SIM) cards were found hidden between the case and the phone, and for the purposes of this affidavit and application to search are included as part of this device;

i. White iPhone model A1549 bearing IMEI 354449062879714 with silver case

2. Based on the facts set forth in this affidavit, I believe that the SUBJECT DEVICES were used in furtherance of 21 United States Code, Sections 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 844(a) and that there is probable cause to believe that search of the SUBJECT DEVICES will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3. I am a United States Postal Inspector with the United States Postal Inspection Service and have been so employed since September 2016. I am currently assigned to the External Crimes Team, which includes responsibility for Prohibited Mail-Narcotics investigations. As a United States Postal Inspector working with the Prohibited Mail-Narcotics Team, my duties and responsibilities include, but are not limited to, the investigation of shipments of narcotics through the United States Postal Service. As such, I conduct surveillance of suspects, identify and inspect suspicious packages and parcels, work with informants and federal, local and state police narcotics task forces, execute search warrants and make arrests.

4. Prior to my employment with the United States Postal Inspection Service, I served for six years as a Special Agent with the Internal Revenue Service's Criminal Investigation (IRS-CI), and five years as a Tax Fraud Investigative Assistant with IRS-CI. My Special Agent training for IRS-CI included graduating from Federal Law Enforcement Training Center's Criminal Investigator Training Program in Glynco, Georgia.

5. I am a law enforcement officer of the United States within the meaning of Title 18 U.S.C. § 3061, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 21 U.S.C. § 841(a) (1), and other federal offenses.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

7. The United States is investigating a fentanyl trafficking organization that purchases fentanyl, presses the drugs into counterfeit Oxycodone pills, and distributes the drugs via the United States mail. The investigation concerns possible violations of, *inter alia,* 21 U.S.C. §§841(a)(l) and 846.

**Background on the Dark Web Markets ad Cryptocurrencies**

8. Based on my training and experience and on information provided by reliable law enforcement sources, I know that individuals involved in the trafficking of illicit drugs are increasingly using Dark Network Markets ("DNMs") to distribute and purchase

narcotics and materials used to manufacture narcotics. The "Dark Network" or "Dark Web" refers to anypoliion of the Internet that can be accessed only with specific software, configurations or authorization. The most commonly known Dark Network is The Onion Router, otherwise known as TOR. People who access the Dark Network use a series of sites that anonymize their internet traffic, thereby making it difficult for law enforcement to track them via an Internet Protocol addresses. To further criminal activities, those distributing illicit goods, including narcotics, have established websites on the Dark Network, known as DNMs, on which they advertise and sell the illicit materials.

9. Cryptocurrency (also known as digital currency) is generally defined as an electronically sourced unit of value that can be purchased with, sold for, or used as a substitute for fiat currency (i.e., currency created and regulated by a government). Cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.

10. Bitcoin ("BTC"), Bitcoin Cash ("BCH"), Litecoin ("LTC"), and Ethereum ("ETH" or "ether") are types of cryptocurrencies. Payments made with these cryptocurrencies are recorded in a public ledger that is maintained by peer-to-peer verification (i.e., a "blockchain") and is thus not maintained by a single administrator or entity. Cryptocurrencies are widely used to conduct both legitimate and unlawful business. For example, Microsoft accepts bitcoins as payment for Xbox games and services. On the other hand, bitcoins were the payment method used on Silk Road and Dream Market, websites on the dark web that offered drugs and other contraband for sale.

11. Individuals can acquire bitcoins, bitcoin cash, litecoins, and ether through, for example, exchanges (i.e., websites, such as Coinbase, that allow individuals to purchase or sell cryptocurrencies in exchange for fiat currency or other cryptocurrencies), ATM's, or directly from other people. Individuals can also acquire cryptocurrencies by "mining." An individual can mine bitcoins, bitcoin cash, litecoins, and ether by allowing his/her computing power to verify and record payments into the aforementioned public ledger. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency.

12. Individuals can send and receive cryptocurrencies through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be done on many types of computers, including laptop computers and smart phones. Even though the public addresses· of those engaging in cryptocurrency transactions are recorded on a public ledger, the true identities of the individuals or entities behind the public addresses are not recorded on the public ledger. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin, Bitcoin Cash, Litecoin, and Ethereum -based transactions are therefore sometimes described as "pseudonymous ," meaning that they are partially anonymous

13. Bitcoins, bitcoin cash, litecoins, and ether can be stored in digital "wallets".  A wallet essentially stores the access code that allows an individual to conduct cryptocurrency transactions on the public ledger. To conduct transactions on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to a traditional bank account

number, while the private key is like the password or PIN used to access that bank account.

14. Exchangers and users of bitcoins, bitcoin cash, litecoins, and ether often store, and transact with, these cryptocurrencies in several ways, utilizing desktop, mobile, and online wallet hardware devices; and paper wallets. Desktop, mobile, and online wallets are electronic in nature and can be stored on mobile devices (e.g., smartphones or tablets) or websites that users can access via a computer, smart phone, or any device that can search the internet. Wallets can also be stored on external or removable media and hardware (such as USB thumb drives).

**The April 3, 2018 Search and Arrest**

15. On April 2, 2018, a Stamford Police Department Confidential Informant (hereinafter "the CI') provided information to the Stamford Police Narcotics and Organized Crime Unit that, within the 24-hour period before speaking to police, s/he saw what appeared to approximately three to four ounces of Carfentanyl packaged in a Ziploc-style bag inside a garage area of 77 West Hill Circle, Stamford, Connecticut. The CI also stated that s/he saw packaging material, scales, and a pill press inside the same residence.

16. The CI further stated that the individual who showed him/her the Carfentanyl inside the garage area of the residence is known to him/her as David Reichard. The CI further stated that Reichard was then residing at 77 West Hill Circle with a friend that is known to him/her "Vinny". "Vinny" has subsequently identified as Vincent Decaro.

17. Based on this information, a Connecticut State search and seizure warrant was presented to and approved by Connecticut Superior Court Judge Comerford on April 3, 2018.

18. On April 3, 2018, members of the Stamford Police stopped Reichard in a vehicle as he was returning to the residence at 77 West Hill Circle. Reichard was found to be in possession of five folds of a brown powdery substance that later field-testing confirmed was heroin.

19. On scene at the time of his arrest, Reichard was verbally advised of his Miranda Rights by Stamford Police Officer Luis Vidal as witnessed by Stamford Police Officer Feldman-Merced. Subsequently, Reichard told law enforcement officers that the Carfentanyl would be contained within Ziploc-type bags in a Pelican case in the rear upper garage area of 77 West Hill Circle. Reichard also stated that there are three pill presses inside a silo shaped room in the same residence.

20. Members of the Stamford Police executed the search warrant of the residence. No other subjects were located inside the residence. Upon their initial sweep of the house to locate any other people therein, members of the Stamford Police observed what they believed to be a clandestine manufacturing area in the rear upper garage area of the residence. Upon determining that this was a clandestine lab and due to the toxicity of Carfentanyl exposure, the Stamford Police Officers backed out of the residence, secured the perimeter, and contacted members of the DEA New England Field Division Clandestine Laboratory Enforcement Team (CLET). Members of the CLET team then responded to the location in the evening hours of April 3, 2018 to conduct a search and evidence collection at the residence with the proper hazardous materials protection.

21. During the search of the rear upper garage area and the silo room of the house, the CLET

members located and seized the following items that were deemed to be related to Carfentanyl processing and distribution:[1]

- Four Mason-type jars containing an unknown white powder;
- One bag of white powder;
- One mail package containing numerous pills;
- One brown Pelican type case containing powder in plastic bags from a tote on the floor;
- Two Mason-type jars with unknown liquid located in tote on floor;
- Two pieces of paper that appear to containing instructions on preparation of the Carfentanyl;
- One hazardous material suit and one gas/respirator type mask;
- One scale with residue located on small table;
- Three pill presses (each containing powdery residue), inside of which were tools and dies used to mark pills "A 215";
- numerous bags of powder, mixers, strainers, funnel; and
- Numerous empty United States Postal Service mail envelope

22. Located in a safe inside the residence, CLET team members located another package containing numerous blue colored pills, a 7.62 caliber rifle, and various paperwork in the name of Vincent Decaro. That paperwork included Decaro's birth certificate, high school diploma, a car title, as well as two pieces of paper on which was handwritten information concerning two digital currency accounts.

---

[1] 1 It should be noted that the following list is not a total list of all evidence seized but a portion of what was documented and seized

23. Inside another bedroom utilized by Reichard, CLET team members seized a laptop computer, a cellular telephone, and as another mail envelope with numerous blue pills located in the desk drawer. These pills were also stamped "A 215".

24. Based on the agents' training and experience as relayed to me, I know that narcotics traffickers market and press fentanyl and its variants, such as Carfentanyl, into pills to be sold as counterfeit Oxycodone. Due to the possible exposure to Carfentanyl, it was impossible to determine exactly how many counterfeit Oxycodone pills were seized during the search. Investigators have examined the drug evidence in this investigation and in my estimation, there were over fifteen hundred counterfeit pills seized at the residence. The pills are light blue in color and stamped with the imprint "A 215" on one side of the pills. An internet search of that imprint indicated that the, "A 215" imprint is for a 30-milligram Oxycodone Hydrochloride tablet.

**Reichard's Post-Arrest Statement to Law Enforcement**

25. The next day, members of the DEA Bridgep01t Resident Office, the United States Postal Inspection Service, and the Stamford Police Department conducted a videotaped interview of Reichard. Reichard stated that he began living with Decaro at the 77 West Hill Circle residence in February of 2018. Reichard stated that after approximately one week at the house, Decaro came to him late at night and asked for his assistance, and proceeded to hand Reichard a pair of latex gloves and a disposable type dust mask. Decaro asked Reichard to tum on the stove to 170 degrees, which he did. Decaro then went outside to the garage area of the house and came back with two mason jars and two sheet pans. Inside the two mason jars was a liquid. Decaro further explained the process to Reichard in which they took the liquid mason jars, added powder and then hand mixed

the contents. They then poured the contents into the baking sheet pans and placed them in the oven. Reichard stated that Decaro told him that, while he would explain more in the morning, this is how he (Decaro) made his money. The next day Reichard stated that Decaro showed him the silo room, which contained the pill presses. Decaro utilized the substances he baked in the oven from the previous night to make blue colored pills stamped "A 215". Reichard described these pills as 30mg Percocet pills. Reichard stated that Decaro utilized the "dark web" to purchase the Carfentanyl and used a dark web website to sell the pills to buyers all over the United States.

26. Reichard further explained that Decaro would utilize the United States Postal Service to ship the pills to customers who purchased his product over the dark web. Reichard stated that, on one occasion, he accompanied Decaro to the post office in Stamford, Connecticut to ship numerous packages of pills. Reichard stated that he (Reichard) personally carried several packages he knew contained these counterfeit Oxycodone pills into the post office.

27. Reichard stated that Decaro went to Europe approximately three to four weeks ago for a vacation and to visit a friend who had previously lived in Stamford. Reichard stated that, while Decaro was away, he called Reichard and told him to download the WhatsApp phone application so they could communicate. Once that was done, Reichard stated Decaro asked him to make a batch of pills and that he would have to start from the beginning by mixing the Carfentanyl in the garage area to be baked as described earlier. Reichard stated that he was planning on communicating with Decaro via FaceTime so that Decaro could further show him how to mix the Carfentanyl. Reichard further stated

that Decaro last held legitimate employment two years ago and has not lawfully worked since

**Prior Packages to Decaro's Residence**

28. On or about August 11, 2017, agents from United States Customs and Border Protection Service conducted a border search of a parcel at the FedEx hub in Memphis, Tennessee The parcel originated from China, was labeled as "Surfactant", and was addressed to '"Vince DeCoro, 77 West Hill Circle, Stamford CT 06902". Upon inspection, agents determined that t parcel contained ru1 unknown white powdery substance in a clear Ziploc bag, which was later tested and determined to contain 11.8 grams of Benzyl Fentanyl

**Arrest of Isaku and Decaro in Las Vegas**

29. On or about June 17, 2017, Decaro and Isaku were arrested by Las Vegas police officers for possession with intent to distribute MDMA.

30. On that date, having seen Decaro and Isaku behave suspiciously at a music festival, officers approached both men and identified themselves verbally as police officers. One officer asked Decaro if he had any Ecstasy on him and Decaro stated that he did. At the officer's request, Decaro removed a Ziploc baggy from his right front pocket containing 10 pink tabs with a total of 3.9 gross grams consistent with MDMA. The officers also spoke with Isaku, who told them that he had four tabs of Ecstasy in his pocket. Isaku removed a cigarette wrapper from his left front pocket containing four blue tabs with a total gross weight of 0.7 gross grams and the tabs were consistent with ecstasy tabs. The officers then arrested both men for possession of controlled substances with intent to sell.

**Prior Packages Seizure and Arrest of Arber Isaku**

31. On or about August 23, 2017, member of the Connecticut State Police made controlled delivery a facsimile package to an individual known as Arber Isaku at 52 Mitchell Street in Stamford, Connecticut with a phone number of 203-249-8635 ("the Isaku Phone"). Earlier members of the CBP had seized a package addressed to Isaku that contained160 grams of fentanyl HCL[2].

32. After knocking on the door, Isaku came outside where the officer, dressed as a delivery man, explained that he had a package for an Arber Isaku and that the package was put the wrong truck, so he was out to personally deliver it. Isaku first stated that he did not order anything. He appeared very nervous and continued to look at the officer's shirt and back to his van. When the officer said that he would take the package back, Isaku stopped the officer and said that he would take the package. Isaku then questioned the officer's shirt, saying that the package was sent via USPS and the officer was wearing a UPS shirt. The officer advised him that he was an independent contractor and delivered for all of the mailing companies. He advised Isaku that he had to sign for the package and Isaku did so, printing his name and the phone number assigned to the Isaku Phone.

33. Once Isaku took possession of the package and signed for it, a signal was made and officers exited the van and took custody of Isaku. On his person, officers located a plastic bottle containing what appeared to be 38 Oxycodone pills. Pursuant to a state search warrant, officers seized from Isaku's residence the following: (a) one 30-06 caliber rifle;

---

[2] 2 Due to the fact that Fentanyl Analogs may be hundreds of times more potent than heroin and tend to produce significantly higher respiratory depression and in some cases fatalities have occurred, the original parcel and contents were packaged and sent to the CPB Lab.

(b) ammunition; (c) 159 apparent Oxycodone pills; (d) four vials of steroids; and (e) a laptop computer.

34. Following his arrest, Isaku was released on bond. On September 16, 2017, Isaku flew from Boston, Massachusetts to Madrid, Spain and subsequently traveled to Albania.

35. On April 11, 2018, DEA Task Force Officer (TFO) Sean Krauss examined several of the apparent Oxycodone Pills that were held in storage at the Connecticut State Police Evidence Vault in Meriden, CT. Every Pill that TFO Krauss examined were stamped "A 215" and were a light blue color. The same stamped pills were located at the 77 West Hill Circle residence on April 3, 2018. TFO Krauss also observed that the pills at the state police vault were crumbling and breaking apart. Based on TFO Krauss' training and experience, he believed that the pills were possibly counterfeit pills. With this information, the pills were subsequently requested to be removed from storage and sent to the Connecticut State Police Laboratory for analysis.

**Use of Cryptocurrency**

36. On or about April 13, 2018, I and other law enforcement officers interview Reichard. During the interview, Reichard spoke in greater detail about Decaro's use of the Da Web. Reichard stated that Decaro admitted to purchasing and distributing Carfentanyl utilizing the Dark Web. According to Reichard, Decaro used bitcoin to buy Carfentanyl and was paid by his customers in bitcoin for his subsequent Carfentanyl sales. Reichard stated that Decaro sold counterfeit Oxycodone pills containing Carfentanyl on a Dark Web Market that contained the word "Dream". I know based on my training and experience that Dream Market has historically be one of the largest DNMs.

37. Reichard told law enforcement officers that during his stay at the house, Decaro had shown him on a device that Decaro's bitcoin balance was approximately $660,000. Reichard further stated that Decaro had bragged that at the height of the bitcoin market, Decaro bad become a millionaire.

38. Reichard stated that Decaro had utilized a laptop computer in Decaro's room to print out shipping labels for all of the customers who purchased the counterfeit pills. Based on my training and experience and on information provided by reliable law enforcement sources, I also know that DNM Vendors often use third-party postage services to add additional layers of anonymity to their transactions. These services allow their customers to purchase postage using cryptocurrency via the computer.

39. Reichard also stated that Isaku and Decaro were business partners in the Dark Web drug trafficking. According to Reichard, Isaku had purchased the 170 grams of fentanyl that law enforcement interdicted with the intention of pressing and distributing the drug with Decaro.

40. I know that there is probable cause to believe Decaro and Isaku were operating under the alias "eastcoastcartelkings", also known as "ECCK". As part of a long-term criminal investigation, federal law enforcement agencies seized the servers through which a DNM named Hansa Market had run. Based on information from that seizure, "eastcoastcartelkings" registered a Hansa Market account on or about July 6, 2017. The data also contained bitcoin wallet addresses (a) to which refunds would be posted and (b) which acted as the vendor bond for the account. Specifically, the refund wallet address was listed as 12hsYQJ6QKwIU66pS65GsqVzmsikdtK.a3m and the vendor bond wallet address was listed as l 2Bogh3xUUCQ6TMKQvNK.sNGnE4pEX38hgG.

41. I also reviewed records from a digital currency exchange called Coinbase related to Isaku. Coinbase is headquartered in San Francisco, California. Specifically, the Coinbase records showed that Arber Isaku owns a Coinbase account in which multiple wallets are organized under the name "Arbyscoins". One of those wallets was created on or about July 5, 2017 and had the address of 2hsYQJ6QKwlU66pS65GsqVzmsikdtK.a3m - the same wallet address used as the refund wallet for the "eastcoastcartelkings" Hansa Market account. The Isaku Coinbase account documents also showed a transfer of .05079822 BTC to the 12Bogh3xUUCQ6TMK.QvNK.sNGnE4pEX38hgG wallet - the wallet used for the "eastcoastcartelkings" Hansa Market vendor bond - on or about July 7, 2017. I believe based on my training and experience that this transaction was the payment of the Vendor Bond to Hansa Market.

42. At the time of the search of the Premises, the Stamford Police did not know that Decaro and Isaku were DNM vendors with extensive digital currency holdings. Hence, they did not specifically search for or seize items that could have been virtual currency hard wallets. As referenced above, such wallets can also be stored on external or removable media and hardware (such as USB thumb drives).

**Indictment and Arrest Warrants**

43. On August 7, 2018, a Federal grand jury sitting in New Haven, Connecticut returned a True Bill Indictment charging Decaro, Isaku, and Reichard with the crimes alleged in this affidavit. Arrest Warrants were issued for all three defendants, but Decaro and Isaku remained at large. An Interpol Red Notice was requested and was subsequently published. The United States Government also entered into a Mutual Legal Assistance

Treaty with the Government of the Republic of Albania requesting assistance in locating and arresting Decaro and Isaku, as well as the execution of search warrants on their homes, vehicles, and persons.

**Arrest of Decaro and Isaku**

44. On September 21, 2018, pursuant to the Interpol Red Notice, Decaro and Isaku were arrested by Albanian law enforcement as they were trying to leave Albania for Kosovo in an Albanian taxi. Albanian authorities conducted a search incident to arrest of Decaro and Isaku, and both men were subsequently detained at an Albanian Prison in Kukes. Albanian authorities communicated the arrest through diplomatic channels at INTERPOL. Among the items recovered during the search were:

   a. a U.S. Passport in the name of VINCENT DOMINIC DE CARO (Passport Number 561257572);

   b. a U.S. Passport in the name of ARBER ISAKU (Passport Number 586454922);

   c. various credit and debit cards in the names of Isaku, Decaro, and Dafina Isaku;

   d. White iPhone with red and white case with the word "Supreme" printed on it. Two SIM cards were found between the case and the iPhone. The SIM Cards bear the following numbers, respectively, "048501197" & "048501205". This device was recovered from Isaku during his arrest by Albanian Law Enforcement officers.

   e. White iPhone model MQ7T2LL/A with serial number C6KVCEPTJC6M in a black case which was recovered during the search incident to arrest of VINCENT DECARO by Albanian Law Enforcement, and;

f. An Apple iPad model A1709 bearing serial number DMPWCHUNHPDV, recovered from Isaku incident to his arrest by Albanian Law Enforcement.

45. On September 21, 2018, in accordance with the MLAT between the U.S. government and the Republic of Albania, myself and other U.S. law enforcement personnel traveled to Albania and conducted liaison meetings with Albanian law enforcement and Prosecution Officials. Together, U.S. and Albanian law enforcement travelled to Kukes, Albania to meet with the local prosecutor. The initial intent was to attempt an interview, but due to Albanian legal process the interview was not possible that day.

46. U.S. law enforcement personnel were permitted to look at the digital devices Decaro and Isaku were carrying when they were arrested. The devices were locked, but were preserved so that attempts could be made to crack the passwords at a later date.

47. The Albanian National Police (ANP) were able to track the taxi that had brought Decaro and Isaku out of the city of Tirana to the Kosovo border, and subsequently identified the apartment the two subjects were living in while in the country. The address was identified as Nd.229, H.24, aP.17, NJESIA Administrative Nr.7, 1023 (the "TIRANA RESIDENCE"). The ANP worked with their prosecutors to secure a search warrant for the property in accordance with the MLAT.

48. On September 25, 2018, U.S. law enforcement stood by while ANP continued to work through their legal process to secure a warrant for the residence of the TIRANA RESIDENCE. Once the warrant was secured, Albanian law required Isaku to be transported from the prison in Kukes, Albania to be at the search site. While waiting for the arrival of Isaku, ANP learned that Keith Decaro (the father of Decaro) and Donna Falci (the aunt of Decaro) had landed in Albania. Based on this information,

and out of concern that evidence might be tampered with, ANP assigned officers to secure the residence.

49. While U.S. and Albanian law enforcement were waiting to making entry at the residence, Keith Decaro attempted to enter the residence and was contacted by ANP. During conversation, Keith Decaro advised that his son, Vincent, had been arrested by Albanian law enforcement. Keith Decaro stated that he came to Albania to check on the welfare of his son, and that he was going to the apartment to ensure that Decaro's dog, Hunter, was properly cared for. Keith Decaro further stated that he had gotten the key to the apartment from Dafine Isaku (the sister of ARBER ISAKU).

50. Contact was also made with the Donna Falci and Dafine Isaku outside the apartment building. During a subsequent conversation with Dafine Isaku ANP learned that Dafine Isaku's mother (also Arber Isaku's mother) had called Dafine Isaku, and told her to go to the TIRANA RESIDENCE to remove several computers. Dafine Isaku drove from Macedonia, where she had arrived on September 23, 2018, removed the two laptop computers and one desktop computers, and took them out of Albania and back to Macedonia. Dafine Isaku advised that she had a conversation with Isaku who told her that there was money on the computers. Dafine Isaku agreed to turn the devices back over to the authorities, and was permitted to return to Macedonia to retrieve them. Dafine Isaku never returned, but was later contacted by Macedonian police - at which time she denied knowing anything about computers.

51. During the search of the TIRANA RESIDENCE significant items were retrieved that indicate that Decaro and Isaku had either started to, or were about to, start synthesizing fentanyl. There were multiple kilogram quantities of what are believed to be precursor

chemicals from China along with documents that appear to show a formula to synthesize fentanyl.

52. Also located during the search of the TIRANA RESIDENCE were:

    a. tools and dies used in the pressing of Xanax tablets,

    b. what is suspected to be approximately one kilogram of alprazolam powder (the active chemical in Xanax),

    c. a USPS parcel sent from Fort Meyers, FL (which appears to be from a known dark web fentanyl vendor),

    d. Black Microsoft Surface Pro Tablet computer with serial number 025789454253; One red SanDisk Cruzer Blade 16GB USB storage device;

    e. One blue and silver USB storage device with the following imprinting "Team 16GB/3.0";

    f. Black Meizu cellular phone – this device does not appear to have a visible serial number or model number;

    g. Red Seagate FreeAgent GoFlex with Product Number: 9ZF2A9-501 and Serial Number: NA02L95D;

    h. White iPhone model A1549 bearing IMEI 354449062879714 with silver case

53. At the conclusion of the search Isaku affirmatively stated that his name was ARBER ISAKU, and that he knew he was wanted by the U.S. Government. Isaku advised that he shared the apartment with Decaro. As further indicia of occupancy of the apartment Inspector Tendler, Special Agent Mensing and TFO McMahon noted that the German shepherd at the apartment in Tirana, Albania appeared to be the same dog they had encountered at Decaro's residence in Stamford, Connecticut in April of 2018. Isaku

advised that this dog's name was 'Hunter' and that this was Decaro's dog that had been living in Stamford, Connecticut previously.

54. On September 26, 2018, U.S. law enforcement again worked with ANP and the Albanian prosecutor to secure access to interview Decaro at the prison in Kukes, Albania. Decaro was provided with a verbal Miranda warning by U.S. personnel out of an abundance of caution, and was provided with a written rights warning by Albanian law enforcement. Decaro declined to provide information and invoked his right to counsel. Decaro did affirmatively state that he was VINCENT DECARO from Stamford, Connecticut. Decaro also annotated the Albanian rights form saying that he declined to sign the form but that his name was VINCENT DECARO. Decaro advised that he was living in the apartment in Tirana, Albania with Isaku and his [DECARO's] dog, 'Hunter'.

55. On September 27, 2018 I met with the Albanian prosecutor, who transferred the SUBJECT DEVICES to my custody.

**Technical Terms**

56. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. There are currently two types of IP addresses in use in the United States, one type is known as an IPV4, and the other is an IPV6. An IPV4 address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). An IPV6 address are represented as eight groups of four hexadecimal digits with the groups being separated by colons, for example 2001:0db8:0000:0042:0000:8a2e:0370:7334,

but methods to abbreviate this full notation exist. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

 b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

 c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

57. As described above and in Attachment B to the search warrants for the SUBJECT DEVICES, this application seeks permission to search for records that might be found in the SUBJECT DEVICES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

58. *Probable cause.* I submit that there is probable cause to believe those records will be stored on SUBJECT DEVICES, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.   *Forensic evidence.* As further described in Attachment B to SUBJECT DEVICES warrants, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT DEVICES because:

f.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

g. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial

evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

h.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

i.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether

data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

j.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

k.  I know that when an individual uses a computer to access the DNMs, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

l.  *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the

26

premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

m. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

n. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.

However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

o. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

p. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## AUTHORIZATION REQUEST

59. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41, as this affidavit supports probable cause for such warrants to search the SUBJECT DEVICES described in Attachment A-1 through A-9, and seize the items described in Attachment B.

JEREMY S. TENDLER

UNITED STATES POSTAL INSPECTOR

Subscribed and sworn to before me on the 18th of October, 2018

/s/ Sarah A. L. Merriam, USMJ

SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

The device to be searched is described as follows: One black Microsoft Surface Pro Tablet computer with serial number 025789454253 recovered from Decaro's bedroom by ANP during a search of DECARO and ISAKU's residence located at Nd.229, H.24, aP.17, NJESIA Administrative Nr.7, 1023.

## ATTACHMENT A-2

The device to be searched is described as follows: One Apple iPad model A1709 bearing serial number DMPWCHUNHPDV, recovered from ARBER ISAKU incident to his arrest by Albanian Law Enforcement at the Albania/Kosovo border on September 21, 2018.

## ATTACHMENT A-3

The device to be searched is described as follows: One red SanDisk Cruzer Blade 16GB USB storage device recovered by ANP during a search of DECARO and ISAKU's residence located at Nd.229, H.24, aP.17, NJESIA Administrative Nr.7, 1023.

**ATTACHMENT A-4**

The device to be searched is described as follows: One blue and silver USB storage device with the following imprinting "Team 16GB/3.0" Recovered during a search of ISAKU and DECARO's residence located at Nd.229, H.24, aP.17, NJESIA Administrative Nr.7, 1023.

**ATTACHMENT A-5**

The device to be searched is described as follows: One black Meizu cellular phone recovered during a search of ISAKU and DECARO's residence located at Nd.229, H.24, aP.17, NJESIA Administrative Nr.7, 1023

**ATTACHMENT A-6**

The device to be searched is described as follows: One red Seagate FreeAgent GoFlex with Product Number: 9ZF2A9-501 and Serial Number: NA02L95D recovered during a search of ISAKU and DECARO's residence located at Nd.229, H.24, aP.17, NJESIA Administrative Nr.7, 1023

**ATTACHMENT A-7**

The device to be searched is described as follows: One white iPhone model MQ7T2LL/A with serial number C6KVCEPTJC6M in a black case which was recovered from VINCENT DECARO incident to his arrest by Albanian Law Enforcement at the Albania/Kosovo border on September 21, 2018.

## ATTACHMENT A-8

The device to be searched is described as follows: One white iPhone with red and white case with the word "Supreme" printed on it. Two SIM cards were found between the case and the iPhone. The SIM Cards bear the following numbers, respectively, "048501197" & "048501205". This device was recovered from ARBER ISAKU incident to his arrest by Albanian Law Enforcement at the Albania/Kosovo border on September 21, 2018.

## ATTACHMENT A-9

The device to be searched is described as follows: One white iPhone model A1549 bearing IMEI 354449062879714 with silver case recovered during a search of ISAKU and DECARO's residence located at Nd.229, H.24, aP.17, NJESIA Administrative Nr.7, 1023

## ATTACHMENT B

### *Property to be seized*

All electronic records and data relating transactions that constitute violations of 21 U.S.C. Section 841(a) and 846, those violations involving Vincent Decaro or Arber Isaku and occurring after July 1, 2017, including:

1. lists of customers and related identifying information;

2. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

3. any information related to sources of narcotic drugs (including names, addresses, phone numbers, or any other identifying information any information recording Decaro's, Isaku's, or Reichard's schedule or travel from 2017 to the present;

4. all bank records, checks, credit card bills, account information, and

5. Other financial records.

6. Photographs depicting narcotics trafficking activity (including screenshots of Dark Net Markets, Customer Lists, or Cryptocurrency)

7. Any and all transaction records for cryptocurrency;

8. Any and all wallet or public addresses associated with cryptocurrency,

9. Any and all private keys associated with cryptocurrency; and

10. Any and all cryptocurrency contained within the wallets.

Computers or storage media used as a means to commit the violations described above for any computer or storage medium whose seizure is otherwise authorized by the warrant, and any computer or storage medium that contains or in which is stored records information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

     a. evidence of who used, owned, or controlled the COMPUTER at the time the thin described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging log photographs, and correspondence

     b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, a records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in the attachments

n. Routers, modems, and network equipment used to connect computers to the Internet

As used above, the terms "records" and "information" includes all forms of creation storage, including any form of computer or electronic storage (such as hard disks or other med that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negative videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical or other high speed data processing devices performing logical, arithmetic, or storage function including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.